UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                       :

SINDY COHEN,                                     :

                            Plaintiff,      :

                                       :

                -against-             :

                                       :

VINCENT CANNAVO, in his official capacity as  :        11 Civ. 5482 (JPO)
Program Director of the Adult Care Facility      :
Program of the Metropolitan Area Regional Office :
of the New York State Department of Health, and  :       MEMORANDUM
NIRAV R. SHAH, in his official capacity as       :      OPINION AND ORDER
Commissioner of the New York State Department  :
of Health,                                    :

                                       :

                        Defendants.  :

                                       :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

       The New York State Department of Health regulates the State's 450 adult care facilities,

conducting inspections, finding violations of law, and requiring corrective actions by the

facilities. A facility's *residents* are generally not included in the Department's enforcement

scheme—although they may file complaints against a facility, triggering an investigation by the

Department, and they are often affected by the Department's findings and directives. This case

presents the question whether the residents of adult care facilities have a procedural due process

right to participate in the agency proceedings when a facility contests an unfavorable

determination by the Department.

       Plaintiff Sindy Cohen, a resident of Elm York Home for Adults in East Elmhurst, New

York, filed this lawsuit under 42 U.S.C. § 1983, alleging violations of her constitutional rights to

due process by Defendant Vincent Cannavo, in his official capacity as Program Director of the

Adult Care Facility Program of the Metropolitan Area Regional Office ("MARO") of the New

York State Department of Health (the "Department"), and against Nirav R. Shah, in his official capacity as Commissioner of the Department.  Defendants now move to dismiss this claim due to Plaintiff's lack of standing and for failure to state a claim on which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons that follow, the Court holds that Plaintiff does have standing to bring this case, but that her claim fails on the merits. Accordingly, Defendants' motion to dismiss is granted.

## I.    Background

### A.    Regulatory Background

The New York State Constitution provides that

> [t]he care and treatment of persons suffering from mental disorder or defect and the protection of the mental health of the inhabitants of the state may be provided by state and local authorities and in such manner as the legislature may from time to time determine. The head of the department of mental hygiene shall visit and inspect, or cause to be visited and inspected by members of his or her staff, all institutions either public or private used for the care and treatment of persons suffering from mental disorder or defect.

N.Y. Const. art. XVII, § 4.

New York's Social Services Law ("SSL") requires the Department to oversee the approximately 450 adult care facilities in New York State.  *See* SSL § 461-a(1).  Pursuant to those duties, the Department must conduct unannounced inspections of each facility every 12 or 18 months (depending on the facility's "rating").  *Id.* § 461-a(2).  The Department is also required to establish procedures for "complaint inspections"—investigations undertaken in response to complaints raised by the adult home residents.  *Id.* § 461-o.

The Department has promulgated regulations setting forth certain procedures for inspections.  *See* N.Y. Comp. Codes R. & Regs. tit. 18 ("18 NYCRR"), § 486.2.   After an inspection is completed, the Department must submit a written report to the home's operator,

2

identifying any areas that are in violation of applicable requirements, and providing directions "as may be appropriate as to the manner and time in which compliance with applicable requirements of law or regulations shall be effected." *Id.* § 486.2(i).  The home then has thirty days to correct the violations or, if correction requires more than thirty days, to submit an "acceptable plan for correction." *Id.* § 486.2(j).  The home operator must post the inspection report for the most recent complete inspection "conspicuously in a public area of the facility which is accessible to residents and visitors." *Id.* § 486.2(l).  The regulations also provide that "[a]fter a complaint investigation has been completed, the [D]epartment shall advise the complainant of the findings and corrective action, if any.  However, a complainant shall not be advised of the outcomes of an investigation which is being contested by an operator or when civil or criminal action might be compromised by such notice." *Id.* § 486.2(o).

The regulations do not provide any formal procedural rules for when an "investigation . . . is being contested by an operator," which the parties in this case refer to as an Investigation Review Process ("IRP"). *Id.*  The Complaint ("Comp.") alleges (and Defendants do not appear to contest) that the IRP is a "closed-door appellate proceeding at which the facility could lobby Defendants to reverse, rescind, and/or revise their findings and the correction action" ordered after a complaint inspection.  (Comp. ¶ 6.)  In other words, representatives of the Department, and the adult home operator and its counsel may participate in the IRP; the complaining resident is not permitted to participate.  The Complaint also alleges that an adult home that has requested an IRP need not take the corrective action ordered by the Department until the IRP is completed and Defendants make a final determination on the appeal.  (Comp. ¶ 59.)

The Complaint alleges that the Department may revise a statement of deficiencies and corrective order as a result of an IRP, and may do so without reversing the findings against the

adult home made through the complaint investigation.  The Complaint further alleges that "it is Defendants' policy to withhold from Plaintiff and other adult home residents all details regarding the precise corrective action ordered by the Department as a result of a substantiated complaint investigation."  (Comp. ¶ 78.)  Thus, "Plaintiff and other adult home residents have no opportunity to learn about changes to corrective action orders made after an initial inspection report is issued by" the Department.  (Comp. ¶ 80.)

The regulations provide that the Department "may undertake enforcement action against any operator of an adult care facility who fails to operate the facility in compliance with applicable provisions of law and regulation."  18 NYCRR § 486.1(d).  The regulations give the Department fairly wide discretion in choosing the appropriate enforcement action.  The options include, but are not limited to:

> (1) issuance of notice of intention to initiate enforcement;
> (2) conduct of hearings to determine if an operator has failed to comply with applicable law and regulation;
> (3) determination, after hearing, that civil penalties should be imposed;
> (4) determination, after hearing, to revoke, suspend or limit an operating certificate;
> (5) issuance of a commissioner's order, or an order approved by a justice of the Supreme Court, requiring an operator to immediately remedy conditions dangerous to residents;
> (6) temporary suspension or limitation of an operating certificate upon finding that resident health and safety are in imminent danger;
> (7) request to the Attorney General to seek an injunction against an operator for violations or threatened violations of law or regulation; or
> (8) request to the Attorney General to take such action as is necessary to collect civil penalties, seek criminal prosecution, or to bring about compliance with any outstanding hearing determination or order.

*Id.* § 486.4(b).

The Social Security Law also expressly provides certain statutory rights to residents of adult homes.  Each home is required to enter into a written admission agreement with a prospective resident that sets forth all charges, expenses, and other assessments, and enumerates all "services, materials, equipment and food which such operator agrees to furnish and supply to such resident during the period of residency."  SSL § 461-c(2).  The statute expressly provides that there is an implied warranty of habitability in each written admission agreement, and provides a private right of action to a resident for breach of the admission agreement or the warranty of habitability.  *Id.* § 461-c(2-a).

**B.     Facts[1]**

This claim stems from alleged violations of Plaintiff's rights by Elm York, the adult care facility in which she is a resident.  On March 14, 2001, Plaintiff filed a complaint with the Department about these alleged violations.  Specifically, Plaintiff alleged that Elm York's administrator violated her rights by:

> pressuring Ms. Cohen into signing complex financial documents that had the effect of liquidating an Individual Retirement Annuity ("IRA") that had been established for her benefit before she entered the facility; confiscating Ms. Cohen's incoming mail when the proceeds of the IRA liquidation arrived; instructing the facility's employees to open a checking account against Ms. Cohen's will; maintaining control over Ms. Cohen's bank account and using that control to force Ms. Cohen into paying inflated rents and numerous bills for housing related services offered by its corporate affiliate; and failing to assist Ms. Cohen to obtain health care benefits after her previous Medicaid benefits expired, notwithstanding the facility's obligation to assist her under Department regulations.

(Comp. ¶ 40.)

In response to this complaint, in May 2011, the Department conducted an inspection at Elm York.  After this inspection, on June 2, 2011, Cannavo sent Ms. Cohen a letter (the

---

[1] The facts are drawn from the Amended Complaint and are assumed true for purposes of this motion.

"resolution letter") informing her that the Department's investigation "substantiated" her complaint, and stated that "[a]ppropriate violations are being issued for the facility to correct. The operator has the right to contest these violations.  Should there be a change in the status of the report, you will be notified."  (Comp. ¶ 44.)  The resolution letter did not provide Plaintiff with details about the basis of the Department's decision, the specific violations issued, or precisely what corrective action was ordered.

Also on June 2, 2011, Cannavo sent a letter (the "violation letter") and a Statement of Deficiencies to Elm York (together, the "Compliance Instructions").[2]  The Statement of Deficiencies outlined Elm York's various regulatory violations and set forth the corrective action that Elm York was required to take to remedy the regulatory violations.  Specifically, the Department directed Elm York to reimburse Plaintiff over $5,000 in improper charges (including refunds for inflated rent), to submit documentation proving that Ms. Cohen received the refund, to amend its internal policies, to appoint a compliance monitor to ensure that Ms. Cohen's rights would be protected going forward, and to conduct staff trainings in the areas where deficiencies were found.  (Comp. ¶¶ 43, 52.)  The violation letter ordered Elm York to correct the violations within 30 days, and to submit a "Notice of Correction" by July 5, 2011, describing "the facility's efforts to correct the conditions underlying the violations, the operational changes made by Elm York, and the individual responsible for monitoring and documenting Elm York's compliance with corrective action ordered by" the Department.  (Comp. ¶¶ 53-54.)

On June 7, 2011, Plaintiff sent a written request to Cannavo for notice and an opportunity to be heard in the event Elm York requested an IRP in connection with the violation letter.  Elm York did request an IRP on June 13, 2011.  On June 23, 2011, Defendant Cannavo informed

---

[2] Defendants did not provide Plaintiff with a copy of the Compliance Instructions.  Plaintiff obtained the document only after making Freedom of Information Law requests to the Department's Records Access Office.

Plaintiff by letter that Elm York had requested an IRP, describing the IRP as a "meeting . . . for the operator to discuss the findings or violations in the report and provide justification for modifying or deleting these."  (Comp. ¶ 69.)  The letter stated that Plaintiff would be notified of any decision made as a result of the IRP.  Defendants otherwise ignored Plaintiff's multiple requests for an opportunity to participate in the IRP, although Cannavo did inform Plaintiff of the date (but not the location) of the IRP.

On August 22, 2011, Plaintiff was advised that the Department did not change "the survey report" or "the violations" as a result of the IRP, held August 10, 2011.  Defendants did not inform Plaintiff whether the Department revised the restitution order or any other aspect of the Compliance Instructions.  On August 30, 2011, Defendants advised Plaintiff that Elm York may request a "formal hearing" to "further review the violations after the IRP process."  (Comp. ¶ 102.)  There are no promulgated regulations setting forth the procedures for a "formal hearing," and Defendants have refused to provide Plaintiff with an opportunity to appear and be heard at these proceedings.  (Comp. ¶¶ 104, 107.)

As of the date of the Amended Complaint, October 13, 2011, Plaintiff had not received the restitution included in the June 2, 2011 corrective order, and Defendants have otherwise refused to enforce any of the aspects of the corrective order, including the compliance monitoring provisions.[3]

### C.  Procedural History

Plaintiff brought this case on August 8, 2011 under 42 U.S.C. § 1983, alleging that Defendants' refusal to allow her to participate in the IRP violated her due process rights under the Fourteenth Amendment to the United States Constitution.  She also sought a temporary

---

[3] At the oral argument on this motion, held June 25, 2012, Plaintiff's counsel represented to the Court that Plaintiff still had not received the restitution ordered in the Compliance Instructions.

restraining order requiring Defendants to allow Plaintiff to participate in the impending IRP.

The case was initially assigned to Judge Denise Cote.  At a conference held that day, Judge Cote

denied the application for the TRO.  (*See* Dkt. No. 4.)  Judge Cote explained from the bench:

> The New York State Department of Health is a regulator. It is
> regulating the home in which the plaintiff is.  It has a right to meet
> with the regulated, to have conversations with them, to show them
> documents and hear their arguments without third parties,
> including those who are inhabitants of the home, participating.
> Indeed, finding on this record that the plaintiff has a right to
> participate in meetings between the regulated and the regulator, I
> think would be novel and actually burden the ability of the state
> regulator to perform its functions.
> . . .
> Making this finding, however, that there has not been a sufficient
> showing to support entry of a temporary restraining order doesn't
> mean, in my view, that the plaintiff cannot proceed with a 1983
> action separately with respect to her treatment and experience at
> the home and, fundamentally, seek recourse, any damages and
> potentially injunctive relief against the home. And so that's a
> completely separate issue. I think she has rights and can pursue
> them adequately through the court process.

(Dkt. No. 6 at 27-28.)

On October 14, 2011, Plaintiff moved for leave to file an amended and supplemental

complaint.  (Dkt. No. 12.)  On October 25, 2011, the parties filed a stipulation stating that

Defendants consented to the filing of the amended and supplemental complaint, and setting forth

a briefing schedule for Defendants' motion to dismiss.  (Dkt. No. 16.)  The amended and

supplemental complaint added three new causes of action for alleged violations of the Americans

with Disabilities Act, 42 U.S.C. §§ 12131-34 (the "ADA"), and various provisions of state law.

Defendants moved to dismiss the case on November 10, 2011.  (Dkt. No. 17.)  In

Plaintiff's opposition, she consented to the dismissal of her state law claims.  (*See* Plaintiff Sindy

Cohen's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint,

Dkt. No. 21 ("Pl. Opp."), at 2 n. 2.)  The parties later entered into a stipulation dismissing the

ADA claim.  (*See* Dkt. No. 26.)  Thus, the only remaining claim in the case is the § 1983 claim

for violation of Plaintiff's due process rights.

## II.     Discussion

### A.     Motion to Dismiss Standard

In order to survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a plaintiff must

plead sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ]

all inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir.

2006) (internal quotations omitted).  On the other hand, "the tenet that a court must accept as true

all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice."  *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555 (noting that a court is "not

bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Papasan v.*

*Allain*, 478 U.S. 265, 286 (1986))).

### B.     Standing

Defendants argue that Plaintiff lacks standing to bring this suit.

#### 1.     Applicable Law

"[C]onstitutional standing is a jurisdictional prerequisite to suit."  *Lerner v. Fleet Bank,*

*N.A.*, 318 F.3d 113, 126 (2d Cir. 2003).  The Supreme Court has ruled that a district court "must

generally resolve material factual disputes and establish that it has federal constitutional

jurisdiction, including a determination that the plaintiff has Article III standing, before deciding a case on the merits." *Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates, Co.*, 436 F.3d 82, 85 (2d Cir. 2006) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101 (1998)).  This does not mean that the Court "must make a definitive ruling on Article III standing before giving *any* consideration of the merits," but the Court must refrain from making a "definitive ruling on the merits" if it lacks jurisdiction "because of the absence of an Article III requirement, such as Article III standing."  *Alliance*, 436 F.3d at 87.

The constitutional standing requirement is drawn from Article III of the Constitution, which confers on federal courts the power to hear "cases" and "controversies."  The Supreme Court has defined the "irreducible constitutional minimum of standing" as containing three elements:

> (1) that the plaintiff have suffered an "injury in fact"—an  invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 167 (1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  "The party invoking federal jurisdiction bears the burden of establishing these elements."  *Lujan*, 504 U.S. at 561.

Although the requirement of an "injury-in-fact" often collapses into an inquiry into the merits of the claim, courts—including the Second Circuit—have warned against "conflat[ing] the requirement for an injury-in-fact with the constitutional validity of [the underlying] claim." *Dean v. Blumenthal*, 577 F.3d 60, 66 n.4 (2d Cir. 2009).  On the contrary, the Supreme Court

10

"has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim."  *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007) (citing *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975)).

### 2.    Application of Law to Facts

Defendants make four basic arguments why Plaintiff lacks standing to bring these claims: First, Defendants argue, Plaintiff's alleged injuries were caused entirely by Elm York—*i.e.*, the injuries were "the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citation, quotation marks and brackets omitted).  Second, Defendants argue that Plaintiff has no legal interest in enforcement actions that the government takes against other individuals.  Defendants analogize Plaintiff to the victim of a crime, who, courts agree, does not have standing to be involved in the criminal prosecution of the perpetrator of that crime. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.").  Third, Defendants argue that Plaintiff does not have a legally protected interest in actions that are within an agency's discretionary authority to take.  Finally, Defendants argue that granting the relief would not redress Plaintiff's alleged injuries.

Defendants' first two arguments are easily rejected.  Plaintiff explains that she is not seeking to hold Defendants responsible for injuries caused by Elm York, and she is not asserting a legal interest in the Department's general regulatory or enforcement power.  Instead, she asserts that the Compliance Instructions granted her certain property and liberty rights, and that she was deprived of the opportunity to appear and be heard when those rights were threatened by the IRP process.  Further, Plaintiff contends that she continues to be deprived of those rights, even though Defendants have stated that Elm York was unsuccessful in its IRP appeal.

11

Defendants' redressability argument also does not succeed.  Although it is true that granting Plaintiff the right to participate in the IRP may not ultimately change the result of the process, it is well settled that "[t]he right to be heard does not depend upon an advance showing that one will surely prevail at the hearing."  *Brody v. Village of Port Chester*, 345 F.3d 103, 112 (2d Cir. 2003) (Sotomayor, J.) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 87 (1972)).

Defendants' argument that Plaintiff has no "legally protected" interest in actions that are within the Department's discretionary authority to take is less easily disposed of.  This is so because, as explained more fully below, the Court ultimately agrees with Defendants' argument as it concerns the merits of the case.  Thus, if the Court agrees that Plaintiff did not have a legally protected interest in the Compliance Instructions, how does the Plaintiff have standing to assert her claims?

This difficulty is caused in part by the use of the term "legally protected interest" in the definition of "injury in fact" in the Supreme Court's decision in *Lujan*, 504 U.S. at 560.  As other courts have observed, the term has "generated some confusion because the Court has made clear that a plaintiff can have standing despite losing on the merits—that is, even though the interest would not be protected by the law in that case."  *In re Grand Jury 89-2*, 450 F.3d 1159, 1172 (10th Cir. 2006) (citations omitted).  These courts have observed that the term "legally protected interest" is used interchangeably with the more commonly used term "judicially cognizable interest," including in decisions by the Supreme Court that post-date *Lujan*.  *See id.* (noting that the Court's decision in *Bennett v. Spear*, 520 U.S. 154, "may have been trying to dispel some of this confusion by substituting 'judicially cognizable interest'"); *Judicial Watch, Inc. v. U.S. Senate*, 432 F.3d 359, 364, 366 (D.C. Cir. 2005) (Williams, J., concurring) (noting that "the Court appears to use the 'legally protected' and 'judicially cognizable' language

interchangeably," and instructing that "[p]ending Supreme Court clarification, users of the 'legally protected' tag should proceed with caution").

Here, Plaintiff does have a judicially cognizable interest in pressing her claim that the Compliance Instructions granted her property and liberty rights sufficient to trigger her due process rights.  Defendants (and the Court) disagree with Plaintiff's contention on the merits. But for purposes of standing, we are to "assume *arguendo* the merits of [Plaintiff's] legal claim." *Parker*, 478 F.3d at 377.

Notably, none of the decisions that Defendants cite for the proposition that Plaintiff "cannot claim a concrete, legally protected interest in actions that are within [the Department's] discretionary authority to take" holds that the plaintiffs in those cases lost standing to press their claims by virtue of the courts' conclusion that the interests of the plaintiffs in those cases were not legally protected.  (Memorandum of Law in Support of Defendant's Motion to Dismiss the Amended and Supplemental Complaint, Dkt. No. 18, at 12.)  *See, e.g., New York State National Organization for Women v. Pataki*, 261 F.3d 156, 164 (2d Cir. 2001) (hereinafter "*NOW*") (holding that the plaintiffs' interest in particular administrative remedies was "not a property expectation as to which the Constitution mandates due process," but not holding that the plaintiff therefore lacked standing to make their claims).  Of course, it is possible that standing arguments were not raised in those cases.  But Defendants do not cite any authority for the proposition that a plaintiff who loses on the merits of a procedural due process claim necessarily lacks standing to bring that claim.  Although there is some parallel between this case and the cases involving the standing (or lack thereof) of victims of crimes to be participate in the prosecution of others, those decisions make clear that they are driven by the special circumstances of criminal prosecutions. *See Linda R.S.*, 410 U.S. at 619 (holding that "given the special status of criminal prosecutions in

our system," child's mother did not have standing to call upon district attorney to prosecute

child's father for failure to provide child support); *United States v. Grundhoefer*, 916 F.2d 788,

791 (2d Cir. 1990) (explaining that "[t]he direct, distinct and palpable injury in a criminal

sentencing proceeding plainly falls only on the defendant who is being sentenced").

In sum, although, as the Court explains below, Plaintiff does not prevail on the merits of

her due process claim, she has standing to bring that claim.

### C.      Plaintiff's Due Process Claim

#### 1.      Applicable Law

Plaintiff alleges that her right to due process was violated by Defendants' refusal to allow

her an opportunity to appear and be heard in the course of the IRP and appeal proceedings

concerning the investigation of her complaint against Elm York.  "[T]he Due Process Clause

requires that the state not deprive an individual of a significant liberty or property interest

without affording notice and some opportunity to be heard prior to the deprivation."  *Gudema v.

Nassau County*, 163 F.3d 717, 724 (2d Cir. 1998); *see also Kapps v. Wing*, 404 F.3d 105, 120

(2d Cir. 2005) ("The requirement that the government afford individuals an opportunity to be

heard is among the most fundamental requirements of the Due Process Clause.").  As the Court

has observed, "[p]rocess is not an end in itself.  Its constitutional purpose is to protect a

substantive interest to which the individual has a legitimate claim of entitlement."  *Olim v.

Wakinekona*, 461 U.S. 238, 250 (1983).  Thus, the "deprivation of a procedural right to be heard

. . . is not actionable when there is no protected right at stake."  *Gagliardi v. Village of Pawling*,

18 F.3d 188, 193 (2d Cir. 1994).

The liberty interests protected by the Due Process Clause are broad.  As the Supreme

Court has explained, these interests include

> not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.

*Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972) (citation and quotation marks omitted).  At the same time, the case law is clear that "that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago County Dept. of Soc. Services*, 489 U.S. 189, 196 (1989) (holding that there is no cause of action for due process deprivation against child protection services officials for failure to prevent abuse by child's parent); *see also Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 750-51 (2005) (holding that there was no "constitutionally protected property interest in having the police enforce [a] restraining order when they have probable cause to believe it has been violated"); *Harris v. McRae*, 448 U.S. 297, 317-18 (1980) ("Although the liberty protected by the Due Process Clause affords protection against unwarranted *government* interference . . . , it does not confer an entitlement to such [governmental aid] as may be necessary to realize all the advantages of that freedom.").

Protectable property interests are not created by the Constitution itself.  For purposes of due process analysis, "'property' denotes a broad range of interests that are secured by 'existing rules or understandings'" stemming from an independent source, such as state law.  *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (quoting *Roth*, 408 U.S. at 577).  As the Supreme Court has explained, "[t]he Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  *Roth*, 408

U.S. at 576.  The Court has made clear that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Roth*, 408 U.S. at 577; *see also Spinelli v. City of New York*, 579 F.3d 160, 168-69 (2d Cir. 2009).

The Second Circuit has clarified that "[a] plaintiff has a legitimate claim of entitlement to a particular benefit if, absent the alleged denial of due process, there is a certainty or a very strong likelihood that the benefit would have been granted."  *Gagliardi*, 18 F.3d at 192 (citation and quotation marks omitted).  Thus, courts consistently hold that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."  *Castle Rock*, 545 U.S. at 756 (citing *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 462-463 (1989)); *see also NOW*, 261 F.3d at 164 ("Where, as here, a purported property interest is contingent on the exercise of executive discretion, no legitimate claim of entitlement exists.  A constitutionally protected interest cannot arise from relief that the executive exercises unfettered discretion to award." (citation and quotation marks omitted)); *Gagliardi*, 18 F.3d at 192  ("Where a local regulator has discretion with regard to the benefit at issue, there normally is no entitlement to that benefit."); *RR Village Ass'n, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1201-02 (2d Cir. 1987) ("[I]f state law makes the pertinent official action discretionary, one's interest in a favorable decision does not rise to the level of a property right entitled to procedural due process protection.").  "An entitlement to a benefit arises only when the discretion of the issuing agency is so narrowly circumscribed as to virtually assure conferral of the benefit."  *Gagliardi*, 18 F.3d at 193 (citation and quotation marks omitted).

Even if enforcement of a particular provision of law is mandatory and not discretionary, a plaintiff may not have a protected property interest in that enforcement if she is only an

incidental, indirect beneficiary of that enforcement.  This is because "[a]n entitlement must also

be *individual* in nature to qualify as a property interest protected by the Due Process Clause."

*Harrington v. County of Suffolk*, 607 F.3d 31, 34 (2d Cir. 2010) (holding that there is no

constitutionally protected property interest in adequate police investigations).  "[W]here the

intended beneficiaries of a particular law are entirely generalized, [courts] have held that the law

does not create a property interest protected by the Due Process Clause."  *Id.* at 34-35 (citing

*West Farms Assocs. v. State Traffic Comm'n*, 951 F.2d 469, 472 (2d Cir. 1991) ("[U]niversal

benefits are not property interests protected by the Due Process Clause.")).  Thus, in the *Castle

Rock* case, the Supreme Court held that a woman did not have a protected property interest in the

police's enforcement of a restraining order against her ex-husband.  The Court noted that even if

the relevant statute made enforcement of restraining orders mandatory, "that would not

necessarily mean that state law gave *respondent* an entitlement to *enforcement* of the mandate.

Making the actions of government employees obligatory can serve various legitimate ends other

than the conferral of a benefit on a specific class of people."  545 U.S. at 764-65.  The Court

declined to recognize a property interest that "arises *incidentally*, not out of some new species of

government benefit or service, but out of a function that government actors have always

performed—to wit, arresting people who they have probable cause to believe have committed a

criminal offense."  *Id.* at 766-67.

  In a decision that has obvious implications for the instant case, the Supreme Court held

that the residents of a nursing home did not have a due process right to be heard before the

home's eligibility to receive Medicaid funds was revoked after a finding that the home "no

longer met the statutory and regulatory standards for skilled nursing facilities."  *O'Bannon v.

Town Court Nursing Ctr.*, 447 U.S. 773, 776 (1980).  The Court acknowledged that the closure

17

of the home may impose some hardship on the residents (who would be forced to move to a new home that was still certified).  However, the Court held that the case did "not involve the withdrawal of direct benefits," but rather, "the Government's attempt to confer an indirect benefit on Medicaid patients by imposing and enforcing minimal standards of care" on nursing home facilities.  *Id.* at 787.  The Court concluded that "[t]he simple distinction between government action that directly affects a citizen's legal rights, or imposes a direct restraint on his liberty, and action that is directed against a third party and affects the citizen only indirectly or incidentally" was dispositive of the case.  *Id.* at 788.  It was clear that the residents had a property interest in their Medicaid benefits, and the nursing home itself had a property interest at stake in the decertification proceedings, but because the residents benefited only indirectly from the regulation and certification of the home, they did not have a right to be heard during the decertification process.

### 2.    Application of Law to Facts

There is no dispute that Plaintiff was not given the opportunity to be heard in connection with the Department's investigation and follow-up of her complaint against Elm York.  The case thus turns on whether she was denied the opportunity to be heard in connection with the deprivation of a liberty interest or a property interest to which she had a "legitimate claim of entitlement."  *Roth*, 408 U.S. at 577.

Plaintiff readily concedes that she does not have a protected property interest in "Defendants' generalized enforcement authority."   (Pl. Opp. at 9.)  Instead, she argues that the Compliance Instructions granted her specific benefits which constituted protected property and liberty interests.  Specifically, Plaintiff alleges that she has "a property interest in the restitution included as part of" the Compliance Instructions, and has "a liberty interest in the corrective

actions, policy, training and compliance monitoring ordered in" the Compliance Instructions "as a direct response to abuses that she suffered at Elm York." (Comp. ¶¶ 173-74.)

The Court disagrees with Plaintiff's contentions for two related reasons. First, the Compliance Instructions were "contingent on the exercise of executive discretion." *NOW*, 261 F.3d at 164. And second, although the remedies allegedly ordered in the Compliance Instructions did directly affect (and refer to) Plaintiff, the remedial action ordered was pursuant to the Department's general regulatory and enforcement authority, which is not designed to provide direct benefits for specific individuals.

The statutes and regulations governing the Department's oversight of adult homes contain many mandatory provisions, but also grant the Department a great degree of discretion in how it will carry out investigations and enforce the relevant provisions of law and regulation. For example, the Social Security Law provides that the Department "shall conduct a minimum of one unannounced inspection of each . . . facility to determine the adequacy of care being rendered." SSL § 461-a(2). But the regulations provide that the Department "*may* undertake enforcement action against any operator of an adult care facility who fails to operate the facility in compliance with applicable provisions of law and regulation." 18 NYCRR § 486.1(d) (emphasis added). The Department must prepare a written report of inspection and must send it to the operator of the facility, but the regulations provide that the written report shall include "directions *as may be appropriate* as to the manner and time in which compliance with applicable requirements of law or regulations shall be effected." *Id.* § 486.3(i)(3) (emphasis added). The regulations provide for a broad variety of enforcement mechanisms and leave it to the Department's discretion to determine what action is appropriate in the given circumstances. *See id.* § 486.4(b).

According to Plaintiff, "Defendants appear to argue that they may exercise their discretion so as to allow Elm York to avoid complying with" the Compliance Instructions, which, Plaintiff contends, "is at odds with the New York Constitution, the SSL, and the Department's own regulations."  (Pl. Opp. at 11.)  But the regulations plainly provide the Department with broad discretion to determine whether and how best to enforce compliance instructions.  Indeed, although the Plaintiff refers to the Compliance Instructions as an "Order," it is plain that they did not constitute an enforceable order.  The regulations do not suggest that the result of an inspection will be an enforceable order granting anyone property rights.  The regulations describe a "written report of inspection" that must contain "directions as may be appropriate" for coming within compliance of the applicable laws.  18 NYCRR § 486.2(i)(3).  And the regulations expressly contemplate that "the outcome[] of an investigation" may be "contested by an operator."  *Id.* § 486.2(o).  As the parties agree, this could result in a change to the written report of inspection as well as to any compliance instructions.  In other words, an inspection (and any written report) is only the first step in bringing a facility into compliance with the law, and the Department retains a large degree of discretion as to the appropriate steps to take after an inspection is complete.  Where, as here, the "regulator has discretion with regard to the benefit at issue, there normally is no entitlement to that benefit."  *Gagliardi*, 18 F.3d at 192.

More importantly, the Compliance Order was issued in the Department's capacity as a regulator of adult homes generally, and Plaintiff cannot claim an individual property interest in the remedial action ordered pursuant to that regulatory authority.  The regulations provide for inspection and supervision of adult care facilities to ensure that "all applicable provisions of law and regulation are being complied with."  18 NYCRR § 486.1(b).  Enforcement actions may be

taken against an operator of a facility "who fails to operate the facility in compliance with applicable provisions of law and regulation." *Id.* § 486.1(d).  None of these provisions refers to the resolution of disputes between residents and facility operators, or provides remedies for the benefit of any individual.  The Department is thus no different than any regulatory body or law enforcement agency that is charged with ensuring that the law is followed generally by parties within its jurisdiction (not with providing specific benefits to a particular individual).  Plaintiff is comparable to a citizen who contacts the Department of Sanitation to notify it that his neighbors have left a large pile of trash in their front yard, in violation of local ordinances.  If the Department of Sanitation investigates and orders the neighbors to clean up the trash or face civil penalties, the original complainant would not have a protectable property right in the enforcement of the ordinances, even though the complainant is undoubtedly affected by his neighbor's trash pile (and was the catalyst for the investigation by the regulatory body).  "[Government] action that is directed against a third party"—here, the regulated party, Elm York—"and affects the citizen only indirectly or incidentally" does not give that citizen a protected interest in that action.  *O'Bannon*, 447 U.S. at 788.

Plaintiff argues that the Compliance Instructions were not simply general regulations, but rather were "specifically formulated to protect Plaintiff's actual property, recognized federal rights, and [] other liberty interests . . . ."  (Pl. Opp. at 8-9.)  But in that regard Plaintiff is no different from the plaintiff in *Castle Rock*, who was the holder of a restraining order issued specifically for the protection of her and her family.  There, the Supreme Court held that the plaintiff nevertheless did not have a property interest in the enforcement of the order because her interest arose "*incidentally* . . . out of a function that government actors have always performed"—*i.e.*, enforcement of the criminal law.  545 U.S. at 767.  Similarly, in this case,

although the Compliance Instructions did include taking certain action that would directly benefit Plaintiff, the Instructions were nevertheless designed to bring the home into compliance with the law in general, which is something that benefits all Elm York residents (and society as a whole).

Plaintiff argues that the Compliance Instructions were equivalent to a judgment issued in the Department's "judicial or quasi-judicial capacity" because they were issued "after gathering evidence and ascertaining specific facts with regard to Plaintiff's claims against the facility . . . ." (Pl. Opp. at 9-10.)  Plaintiff cites the New York Court of Appeals decision in *Hecht v. Monaghan*, 307 N.Y. 461, 121 N.E.2d 421, 425 (1954), for the proposition that an administrative agency acts in its judicial or quasi-judicial capacity when it "ascertain[s] . . . the existence of certain past or present facts upon which a decision is to be made and rights and liabilities determined."  But that same decision holds that, although "[t]echnical legal rules of evidence and procedure may be disregarded" at such a hearing, "no essential element of a fair trial can be dispensed with unless waived.  That means, among other things, that the party whose rights are being determined must be fully apprised of the claims of the opposing party and of the evidence to be considered, and must be given the opportunity to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal[.]"  *Id.*  Plainly, none of these "essential element[s] of a fair trial" exists with respect to complaint inspections.  Indeed, the most involvement that the regulations mandate for the operator of a facility is that "[w]hen a complaint investigation is being conducted, the department shall advise the operator of the complaint, review, findings, and prescribe corrective action."  18 NYCRR § 486.2(n).  And where notice would jeopardize the complainant's confidentiality or where criminal wrongdoing is involved, the operator is not notified of the investigation at all.  *Id.*  The operator of the home—the party that is the direct subject of regulation—has no opportunity at the initial

inspection stage to contest the allegations, let alone cross-examine witnesses or offer evidence in rebuttal.  Construing an inspection report or compliance instructions as an enforceable order in the manner Plaintiff suggests thus may deprive *the facility* of due process of law.

Finally, Plaintiff also cannot show a protectable liberty interest in the Compliance Instructions.  Plaintiff notes that the Compliance Instructions "contain[] remedies specifically crafted to ensure that, among other things, she would not suffer infringements upon her private, postal communications or be forced to enter into financial transactions against her will."  (Pl. Opp. at 13.)  But whether or not Plaintiff has a liberty interest in these matters, there is no allegation that *Defendants* are depriving her of these rights at all, let alone doing so without due process of law.  As Plaintiff concedes, there is no "affirmative right to government aid."  *DeShaney*, 489 U.S. at 196.  The most that the Compliance Instructions offer is a directive to Elm York to cease depriving Plaintiff of her rights to liberty.  But as explained above, Plaintiff does not possess a protectable interest in such directives.

In sum, Plaintiff cannot show that she was deprived of anything to which she was legally entitled, and she thus cannot sustain her due process claim.  Of course, Plaintiff may have causes of action against Elm York directly, and she appears to be pursuing such action.  *See Cohen v. Elm York LLC*, No. 11 Civ. 2437 (E.D.N.Y.).  But Plaintiff has not shown that these defendants have violated her right to due process.

**III.     Conclusion**

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted (Dkt. No. 17) is GRANTED, and this case is dismissed.  The Clerk of Court is directed to close this case and terminate all pending motions.

SO ORDERED.

Dated: New York, New York
        September 12, 2012

_____
              J. PAUL OETKEN
        United States District Judge